IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

Walter Jubber,                *

    Plaintiff          *

v.                            *     Civil Case No. 1:19-cv-00717-JMC

Eugene Jubber, *et al.*,      *

    Defendants        *

\* \* \* \* \* \* \*

**Memorandum Granting in Part and Denying in Part Plaintiff's
Motion for Attorney's Fees and Costs (ECF No. 51)**

## I.    BACKGROUND

The underlying claim in this matter involves Defendants' alleged failure to comply with their support obligations pursuant to 8 U.S.C. § 1183(a) and its implementation regulations, 8 C.F.R. Part 213a, after sponsoring the immigration of Plaintiff, a family member from South Africa to the United States. Those obligations, crystalized in Immigration Form I-864, require that the immigration sponsor support the immigrant at 125% of poverty level (currently $21,137 per year or $1761.42 per month) if he or she cannot do so alone, until one of five terminating events has taken place, none of which has occurred.[1] Plaintiff brought suit on March 7, 2019 claiming that his immigration sponsors failed to so maintain him at various times since he became a lawful permanent resident in 2015. (ECF No. 1.)

---

[1] These events are: (1) becoming a US citizen; (2) working (or being credited with) 40 quarters of work under the Social Security Act; (3) termination of lawful permanent resident status accompanied by departure from the United States; (4) after being ordered removed, seeking residence under a different I-864; or (5) death.

Shortly after filing suit, on May 29, 2019, Plaintiff obtained a preliminary injunction from this Court ordering Defendants to pay a fixed monthly amount of $61.42 pending the resolution of the case based on a snapshot of Plaintiff's financial situation at that time. (ECF No. 38). In so doing, the Court agreed that Plaintiff had established a likelihood of ultimately prevailing on the merits, although both past arrearages and future support obligations were strongly contested. (*Id*).

On June 5, 2019, the parties presented for a settlement conference before me. Ultimately, Defendants agreed to pay $21,250, with $9,475 earmarked to settle all claims of past liability, and the remaining $11,750 as a "credit" against future support obligations.[2] (ECF No. 52-2 at pp. 98–109). Beyond the future support credit, the settlement agreement did not otherwise impair Plaintiff's ability to seek damages in the future to the extent Defendants were delinquent (*i.e.,* Plaintiff was not releasing Defendants from any future I-864 support obligations). However, Defendant would agree to apply the $11,750 credit towards those obligations, fully preserving his ability to seek further support payments beyond that amount. (*Id.* at p. 101). As for attorney's fees and costs, the parties agreed to consent to my jurisdiction, brief the issue, and have me render a binding determination. (*Id*).

## II. LEGAL STANDARD

Title 8 of the United States Code 1183a(c) provides for the "payment of legal fees and other costs of collection" among the remedies for successful enforcement of I-864 obligations. *See Younis v. Farooqui*, 597 F. Supp. 2d 552, 554 (D. Md. 2009) (noting sponsor "may also be liable for legal fees and costs of collection"). The Fourth Circuit utilizes a so-called "lodestar" analysis. *McAfee v. Boczar*, 738 F.3d 81, 88 (4th Cir. 2014). First, a court must arrive at the lodestar figure

---

[2] Ordinarily, the Court would not routinely detail settlement negotiations or a settlement agreement between the parties. However, both sides attached their negotiations to their respective filings, and the settlement agreement itself is not subject to a confidentiality clause.

by multiplying the number of reasonable hours expended by a reasonable hourly rate. *Id.* In determining reasonableness of both hours and rate, the court must consider twelve "reasonableness" factors.[3] *Id.* Next, the court must subtract fees for unsuccessful claims unrelated to successful ones. *Id.* Finally, the court should award some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff. *Id*.

In this case, Plaintiff seeks a base amount of fees and costs of $45,775.31 reflecting approximately 125 hours of work and modest costs, and a multiplier of 1.5 pursuant to the lodestar analysis set forth above. Defendants challenge this based on two chief arguments. First, Defendants allege that Plaintiff was not forthcoming with certain financial information that might have justified an offset to the amount sought, delaying resolution of the case. Second, Defendants contend that the degree of success obtained by Plaintiff was minimal in comparison to what was sought, as reflected in the preliminary injunction award of $61.42 per month. The Court begins its analysis below.

A. **Reasonableness of Hours Expended**

When considering the total number of hours expended, the Court employs factors one, two, and seven. In doing so, the Court finds that the roughly 125 hours are largely reasonable[4] under the circumstances, after a review of the detail provided by Plaintiff's counsel both in terms of individual time entries and then in the "stage of litigation" format as required by this Court's Local

---

[3] These factors are: (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases. *Robinson v. Equifax Information Serv.*, 560 F3d 235, 243 (4th Cir. 2009).
[4] As explained more fully below, the Court will deduct certain hours for an unsuccessful motion to strike and what appear to be duplicative entries concerning Plaintiff's counsel's return trip to Seattle.

Rule, Appendix B. (ECF No. 51-2 at pp. 11 *et seq*). In addition to the usual tasks, *i.e.*, investigating the claim, researching the law and drafting initial pleadings and discovery, Plaintiff also filed a successful preliminary injunction and participated in a successful mediation session. The "novelty and difficulty" factor cuts both ways. On the one hand, this type of litigation is uncommon and somewhat esoteric, which generally requires additional research by the average attorney approaching this subject for the first time. On the other, given Counsel's expertise in this subject area, Counsel was in advantageous position to leverage his expertise in order to address the issues in the case, as he has done in many previous cases. (ECF No. 51-2 at pp. 1–2 and 140). The time entries, in the Court's view, demonstrate that those efficiencies were obtained. As for factor seven—urgency—it is true that the circumstances of a plaintiff arguing for monetary support might provide urgency, but there is no showing that this particular situation was more urgent than any other. This was partially evidenced by Judge Bredar's award of only a modest amount of monthly support in the preliminary injunction order, a reasonable assessment of Plaintiff's financial condition at that snapshot in time. (ECF No. 38).

The Court does note that Plaintiff was unsuccessful in his motion to strike some of Defendant's affirmative defenses. Accordingly, the Court will deduct 5.91 hours. Additionally, the Court notes that on June 5, 2019, Plaintiff's counsel billed 5 hours for travel from Baltimore back to his office in Seattle, Washington. However, he also billed 8.09 hours for that very same travel (which included 45 minutes spent beginning the settlement agreement draft and 4.25 hours preparing a draft of the attorney fee petition). Therefore, the Court will deduct the first 5-hour entry as duplicative.

Defendants' argument as to the hours spent is that Plaintiff and his counsel's behavior inordinately protracted what otherwise could have been a prompt settlement of the case by masking

Plaintiff's true financial situation (which, in turn, would have allegedly mitigated Defendants' support obligation). This is not supported by the record. To be sure, financial information informally exchanged between the parties pre-suit, and various affidavits and information exchanged post-suit makes it unlikely that Plaintiff would have recovered full statutory damages due to likely mitigation. But it is hardly uncommon in litigation that a party's initial broad assertions in a complaint regarding damages go unchallenged during litigation.

Additionally, the pre-suit settlement correspondence exchanged evidences efforts by Plaintiff's counsel to narrow the items in dispute. Further, it included his candid acknowledgment that Defendants' past and present support obligations might well be mitigated by factors such as any earnings by Plaintiff and further evidence of past material support from Defendants. Those efforts are detailed below.

1. Plaintiff's counsel's initial pre-suit letter on December 17, 2018 generally asserted Defendants' support obligation and the components that should be considered in that calculation. (ECF No. 51-2 at p. 51).

2. Defendants responded on December 27, 2018, submitting documentation regarding revenues of Plaintiff's limited liability company during 2017, one of the years for which past arrearages were potentially being claimed. (ECF No. 54-1, pp. 1–18).

3. Plaintiff's counsel responded on January 4, 2019, arguing that the gross revenues for Plaintiff's company would need to be adjusted by any expenses to determine whether Plaintiff had any true earnings. Further, Plaintiff's counsel asked whether similar assertions of earnings attributable to Plaintiff were being made for 2018 and, if so, for Defendants to provide documentation of same. Plaintiff's counsel also invited, "a sensible conversation" as to how to calculate any past support obligation, acknowledging that any such obligation would be mitigated by any earnings by Plaintiffs. (ECF No. 54-1 at pp. 18-19).

4. That same day, Defendants requested time to retain counsel in the case. (ECF No. 54-1 at p. 20).

5. Defendants' counsel's response, later in January, acknowledged the I-864 obligation generally, but contested any outstanding support liability based,

premised in part, on allegations that Plaintiff had income from various sources. Thus, they demanded various financial information to evaluate the claim. (ECF No. 54-1 at pp. 22–27; ECF No. 51-2 at pp. 55–56).

6. Plaintiff's counsel responded on January 30, 2019, agreeing for purposes of calculating *past* arrearages to provide tax information for 2016, 2017 and, when filed, 2018, along with bank account statements. (ECF No. 51-2 at pp. 62–66). Further, Plaintiff's counsel broached the idea of calculating any *present* support obligation at the end of each month while settlement discussions were taking place by submitting documentation of Plaintiff's income for that month as a credit to any support obligation for that month. Importantly, Plaintiff's counsel did not deny that Plaintiff had earnings in the past that might mitigate any support obligation, and affirmatively stated that Plaintiff was currently earning money (hence the proposed procedure for paying present obligations one month in arrears). Similarly, Plaintiff's counsel acknowledged that Defendants may well have met some of their support obligations for past arrearages, requesting as follows:

> To proceed with settlement negotiations, we of course will need to clarify [Defendants'] position as to what support they have provided to [Plaintiff]. He does not dispute that they have provided some support. We ask that they prepare a spreadsheet [documenting any such payments]. (*Id.* at p. 65).

7. On February 4, 2019, Defendants rejected any arrangement regarding present obligations until all financial information, for potential mitigation of past arrearages, was supplied. (ECF No. 51-2 at p.68).

8. That same day, Plaintiff's counsel responded that the issue of any past arrearages could be dealt with by the anticipated exchange of financial information. However, he articulated that this issue should be decoupled from the present support obligations, which Plaintiff's counsel acknowledged could be paid after determining any mitigation credit that might be appropriate to the extent of any earnings by Plaintiff for any given month. (ECF. No. 51-2 at pp. 71–72).

9. On February 5, 2019, Plaintiff's counsel enclosed a draft complaint, foreshadowed a preliminary injunction to determine an appropriate present support obligation while the litigation was pending, and reiterated that an arrangement must be agreed upon for present support obligations to avoid litigation. (ECF No 51-2 at pp. 74–75). Attachments included Plaintiff's bank statements for his personal and business account for January, 2019. Plaintiff's counsel requested a full support payment for January, but also stated, "In the event the parties later determine that Walter had some income for January 2019, we will simply credit the difference to your clients' global settlement." (*Id.* at p. 74).

10. On February 14, 2019, Plaintiff's counsel provided the following information:

   a. Plaintiff's travel history as documented both on his passport and the Customs and Board Patrol I-94 website;
   b. Plaintiff's bank statements for his business and personal accounts from July, 2017 forward (the date Plaintiff moved from Defendants' home and, for settlement purposes, the date being used to determine past arrearages);
   c. Tax documents for 2016 and 2017 (with 2018 promised but not yet prepared);
   d. Disclosure that Plaintiff was being provided housing, but without a formal lease agreement.

(*Id.* at pp. 59–60).

11. On February 28, 2019, Defendants detailed their assessment of the financial information provided, and pointed out that 2018 tax information was not yet provided, nor was any bank account information for any time that Plaintiff might have spent overseas during the year. Notwithstanding the potential that such documents might have supported further mitigation of Defendants' support obligation, Defendants proposed the following settlement:

   a. Based on Defendants' calculations, they asserted that they owed no past support amount at all (and that their past support actually exceeded their statutory obligation by $20,947);

   b. As for future support, Defendants proposed a lump sum settlement amount of $20,212.94, with Plaintiff (and his significant other) waiving any future support.

   c. Defendants agreed to pay up to $2,500 in attorney's fees.

12. On March 7, 2019, Plaintiff's counsel formally rejected the offer. (ECF No. 54-1 at pp. 30–31). Suit was filed that same day. (ECF No. 1). Plaintiffs apparently retained new counsel for the litigation. Although there was some limited settlement correspondence in late April and early May of 2019, the parties' respective positions did not materially change. (ECF No. 54-1 at pp. 32–37; ECF No. 51-2).

The correspondence detailed above leads the Court to three conclusions. First, establishing the precise amount due for past support was still in flux at the time suit was filed. Still, Plaintiff's counsel acknowledged that Defendants might well be entitled to some credit against their past support and future support obligations based both on wages earned by Plaintiff and material

support provided by Defendants. Some efforts were made to provide documentation towards that determination (and requesting documentation from Defendants verifying support they contend they provided).

Second, Plaintiff's counsel acknowledged that Plaintiff had some earnings during the disputed period, and presently, and attempted to quantify those. Plaintiff's counsel recognized that Plaintiff was presently in housing provided by an acquaintance (from which Defendants ultimately argued a further credit was justified). Plaintiff's counsel provided a reasonable framework for determining present support obligations: providing documentation of Plaintiff's salary each month and then having Defendants pay any shortfall.

Finally, Defendants communicated their suspicions that they might be due further credits, but nonetheless communicated a settlement offer consisting of no money for past support, rather only a lump sum of $20,947 for future support (with a waiver of all additional future claims for support). This offer was ultimately rejected.

At the end of their pre-suit discussions, the parties were at a crossroads: (1) spend more time and effort attempting to further quantify the precise amounts owed (with the accompanying fees and costs attendant to that effort); or (2) forego further mathematical precision and mutually agree to a compromise. Neither choice was unreasonable based an analysis of the correspondence above. Thus, the Court finds no bad faith or delay by either side in these initial efforts that would undercut the reasonableness of the number of hours claimed.

Having reached an impasse, the parties proceeded with the litigation. Because Defendants resisted any voluntary agreement regarding payment of support while suit was pending, it was not unreasonable for Plaintiff to seek a preliminary injunction, an effort that was ultimately successful.

Defendants make much of the fact that in his Preliminary Injunction ruling, Judge Bredar found that Defendants were largely meeting their support obligation in light of Plaintiff's earnings at that time, coupled with an offset for the below-market housing and utilities that Plaintiff was receiving.[5]  Further, Defendants attempted to undermine Plaintiff's credibility at the hearing on that motion by, *inter alia*, pointing out inconsistencies between Plaintiff's initial declaration in support of his motion and a supplemental declaration.  Defendants extrapolate from that finding, based on a snapshot of the disputed period, that their support obligation could never have been more than that, making all of Plaintiff's negotiating positions and claims to the contrary disingenuous.  The Court disagrees.

Judge Bredar's assessment found that based on present income of about $100/month in odd jobs, $800 in "under the table" pay, and a housing/utility offset of another $800, an award of $61.42/month would preserve the status quo pending the outcome at trial.  It in no way established that, for example, in 2017 or 2018, Plaintiff's situation was the same.  While it certainly would not have precluded Defendants from arguing that Plaintiff's inconsistencies and present income determination should preclude an award of damages at trial, it similarly would not have precluded Plaintiff from presenting his own evidence at trial that his current situation was precarious and unsustainable.  Thus, the parties were again at a crossroads:  spend more time and effort pursuing these respective lines of argument, or again attempt a compromise, using whatever leverage either possessed to try and extract favorable terms from the other.  As before, neither choice would have been unreasonable, but they are mutually exclusive.

---

[5] Plaintiff disputes the propriety of this offset, but the ultimate settlement negated further pursuit of that issue by way of a Motion for Reconsideration.

The parties re-initiated settlement discussions within days of that May 30, 2019 decision. This resulted in a full and final settlement at the Court-mediated settlement conference on June 5, 2019, less than three months after suit was filed, ultimately memorialized in a fully-executed written settlement agreement on June 10, 2019. Presumably, in agreeing to settle, the parties assessed their respective arguments, the chances that those arguments would be successful in continued litigation/trial, and the cost of advancing those arguments, and found compromise to be the better choice. Accordingly, the Court does find any behavior on behalf of Plaintiff (or Plaintiff's counsel) that would lead it to reduce fees on such basis beyond the adjustments the Court noted above.

B. **Reasonableness of Rates**

In assessing the reasonableness of the rates charged per hour factors three, four, five, six, nine, eleven, and twelve are potentially relevant. In considering the skill required for this type of case, as noted, this is an esoteric area of the law with not many reported decisions, such that finding a lawyer with the requisite skill and experience would be relatively difficult. Similarly, the experience, reputation and ability factor is easily met when considering Plaintiffs' counsels' affidavit (ECF No. 51-2 at pp. 1–9), C.V.s (*Id.* at 120–34), and testimony from other lawyers (*Id.* at 140). Because of the relative rarity of these cases, a "customary fee" is difficult to establish, although the Court is generally assisted by its own fee schedule found in Appendix B of the Local Rules. Similarly, there is not enough of a database to establish "awards in similar cases" to a great degree. Counsel's expectations regarding outcome are addressed in Counsel's affidavit—while establishing the statutory duty is relatively predictable—it is not uncommon to be successful on the merits yet be met with a defendant with little or no ability to satisfy a judgment or claim for fees. (*Id.* at pp. 8–9). The Court does not regard the "preclusion of other employment" or "length

of relationship between attorney and client" as particularly relevant in this analysis. While it is true, as counsel argues, that representing plaintiffs likely limits—and may even exclude—representing defendants in similar litigation (ECF No. 51-1 at pp. 14–15), that is a business choice that counsel has made. As for length of relationship, Plaintiff hired counsel specifically to pursue this claim with no prior history, and this particular matter was concluded within six months of the pre-suit demand.

Mr. McLawsen's rate of $400 per hour exceeds this Court's range for someone of his experience (ten years). This Court's Local Rule, Appendix B, sets forth that for a lawyer with 9–14 years of experience the approved rate is between $225 and $350 per hour. Though Mr. McLawsen's level of experience falls towards the lower end of that range, his subject matter expertise is extensive, and no doubt resulted in efficiencies, as seen in the number of total hours expended in this case. The Court's above analysis of the twelve "reasonableness" factors also justifies an award in the upper end of the range. As a result, the Court will approve a rate at the top of that range–$350 per hour for Mr. McLawsen. (His co-counsel's rate is in accordance with Appendix B and will not be adjusted).

C. **Degree of Success Obtained**

This brings the Court to the most important factor—the degree of success obtained—that will guide its analysis as to whether an upward or downward adjustment to the lodestar is justified. *McAfee* 738 F.3d at 88–9 (citing *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542 (2010)).

Defendants point to the relatively small monthly amount of $61.42 ordered by Judge Bredar as part of the preliminary injunction as the measuring rod for "success" by which Plaintiff's fee petition should be judged. As the Court noted above, however, if this amount fairly captured the monthly deficit at the time of the preliminary injunction hearing in May of 2019, it did not take

into account any past arrearages nor any anticipated change in Plaintiff's financial situation going forward, which Plaintiff characterized as precarious for various reasons.[6]  Plaintiff's claims consisted both of past amounts due and potential future liability, neither of which Judge Bredar addressed conclusively.

Defendants' assertion that informal discovery and investigation undermined some of Plaintiff's claims regarding his past and current financial status might well have had some impact on Plaintiff's ability to recover damages at trial.  But it also might have been the case that Plaintiff would lose his job and housing during the course of litigation, or that Plaintiff would convince the Court to reconsider its imputation of housing/utilities, entitling him to a much bigger monthly award at trial.  But the parties elected not to engage in full discovery and not to go to trial.  Instead, the parties voluntarily negotiated a settlement, presumably after considering these arguments and the relative strengths and weaknesses of their respective cases should they elect to continue the litigation.  In the Court's view, Plaintiff's results cannot be subject to the speculation of what might have happened should litigation have continued, but instead must be assessed on the relief Plaintiff ultimately obtained in the settlement process.

Using that measuring rod, it is clear the Plaintiff achieved reasonable success.  Defendants assert that the settlement amount of $21,225 was not materially more than the $20,212.94 Defendants offered on February 28, 2019.  It must be remembered, however, that Defendants' February 28 proposal offered no money for past support due, and that the settlement offer of $20,212.94 was a one-time lump sum payment cutting off any future support obligation (*i.e.*, a

---

[6] For example, Plaintiff argues that his employment in 2019 at the time of the injunction consisted of odd jobs and "under the table" maintenance work, and his housing was based on the temporary largesse of a co-worker, which was anticipated to end shortly.  Also, Plaintiff was of an advanced age, making it potentially less likely that he would continue to be able to perform this type of work indefinitely.

waiver by Plaintiff of any future support). In the settlement Plaintiff ultimately obtained $9,475 was allocated for past amounts due, and the remaining $11,750 was to be credited against future support obligations, which Plaintiff was free to pursue. (ECF No. 51-2 at p. 101). In other words, although Defendants were granted a limited credit for future support payments, Plaintiff otherwise *completely preserved* his ability to seek that support into the future. Plaintiff made the reasoned decision to put a meaningful sum in his pocket today by presently foregoing (yet preserving for the future) potential payments for future support (less the small credit of $11,750 against such future obligations). Further, although the amount of the preliminary injunction was nominal, Plaintiff established useful precedent for future plaintiffs litigating similar claims.[7]

In sum, while the balance of factors does not favor an enhancement, they do support the fees and costs claimed, subject only to the following adjustments:

a. A deduction of 10.91 hours for the lack of success of the Motion to Strike and what appears to be a duplicative entry of travel time on June 5;

b. A reduction in Mr. McLawsen's rate from $400 per hour to $350 per hour.

The Court Orders Plaintiff's counsel to recalculate the fees sought accordingly, with the recalculated fee bill submitted to the Court and Defendants. Once the bill is so submitted the recalculated fees and the costs should be paid within 60 days, unless Plaintiff and Defendants mutually agree to an alternative payment schedule.

Date: September 9, 2019    /s/
J. Mark Coulson
United States Magistrate Judge

---

[7] Plaintiff's counsel, whose practice is exclusively limited to I-864 litigation, maintains that this is the first preliminary injunction obtained in any such case. (ECF No. 51-1 at p. 13). The Court has not performed its own search to verify this but has no reason to doubt Plaintiff's counsel's statement given his extensive experience in this area of law and his national practice.